IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH—CENTRAL DIVISION

| | |
|---|---|
| PROPERTY MANAGEMENT BUSINESS SOLUTIONS d/b/a REAL PROPERTY MANAGEMENT,<br><br>Plaintiff,<br>v.<br><br>RANDALL AVERITTE,<br><br>Defendant. | MEMORANDUM DECISION AND ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION<br><br>Case No.: 2:18-cv-552<br><br>District Judge: Robert J. Shelby<br><br>Magistrate Judge: Evelyn J. Furse |

Plaintiff Property Management Business Solutions, d/b/a Real Property Management (RPM), sued Defendant Randall Averitte for breach of contract, false advertising, and unfair competition. RPM moved for a preliminary injunction,[1] basing its Motion on the breach of contract claim. The court held an evidentiary hearing on the Motion on August 21, 2018. After full consideration of the parties' briefing and oral argument, the evidence presented, and the relevant legal authorities, the court finds RPM has met its burden for injunctive relief. The court GRANTS the Motion for Preliminary Injunction and ORDERS the injunctive relief specified below.

## BACKGROUND

RPM is a property management franchisor with over 250 franchises in forty-six states.[2] Through its franchisees, RPM provides "third-party residential property management services,

---

[1] Dkt. 11.

[2] Krause Decl., Dkt. 15 at ¶ 2.

including the management of maintenance and repair management services, rent collection, and eviction services."[3]

In 2007, RPM entered into a Franchise Agreement with Averitte, covering the Phoenix, Arizona "territory."[4] The Agreement contemplated an initial term of five years with an option to renew. Averitte renewed the Phoenix Agreement in August 2012.[5] In December 2012, he entered into a second Franchise Agreement with RPM covering the Tucson territory.[6] Each of the Franchise Agreements contains a forum selection clause, mandating legal claims be brought in a court "located in or serving Davis County, Utah."[7] The Agreements also include a choice-of-law provision that calls for the application of Utah law.[8]

Averitte's Phoenix and Tucson Franchise Agreements expired by their terms in August and December of 2017, respectively. As explained below, the parties continued to operate –at least for a time—as if the Franchise Agreements remained in effect. On May 21, 2018, RPM mailed Averitte two letters stating the company would deem any "implied agreement" to continue the franchises to have expired on June 18, 2018.[9] The parties dispute the nature of their communications during the time between the Agreement expiration dates and May 21, 2018. RPM claims the parties were actively negotiating terms for renewal, while Averitte maintains he expressed to RPM he had no intention of renewing his Agreements. Whatever the nature of

---

[3] Dkt. 2 at ¶ 13.
[4] Dkt. 15 Ex. 3.
[5] *Id*.
[6] Dkt. 15 Ex. 5.
[7] Dkt. 15 Ex. 3 at § 22.2; Dkt. 15 Ex. 5 at § 22.2.
[8] Dkt. 15 Ex. 3 at § 22.1; Dkt. 15 Ex. 5 at § 22.1.
[9] Dkt. 15 Ex. 8; Dkt. 15 Ex. 9.

those communications, the parties agree that Averitte continued to pay royalties to RPM and maintain his RPM affiliation until at least June 8, 2018.[10]

In March 2018, Averitte formed a new company, Zorion Real Estate & Property Management (Zorion Management). Zorion Management operates out of the same location as Averitte's Phoenix Franchise.[11] It provides property management services "including residential management, multi-family management, vacation rental management, professional house sitting, commercial property management, HOA management, and traditional real estate services."[12] Averitte maintains that several of the services Zorion Management provides are not offered by RPM.[13]

RPM alleges Averitte's operation of Zorion Management violates several provisions of the Franchise Agreements. Specifically, RPM claims Averitte is in breach of his obligations not to compete with RPM, to transfer property management accounts to RPM upon termination of the Franchise Agreements, to cease holding himself out as affiliated with RPM, and to assign his trade name, Real Property Management Pinnacle, to RPM.

## I. Contract Provisions

Several provisions of the Franchise Agreements rest at the center of RPM's breach of contract claim. Their specific language informs the court's analysis. For that reason, the relevant provisions are recited below in their entirety. These provisions are found in both the Phoenix and Tucson Franchise Agreements.

---

[10] *See* Averitte Decl., Dkt. 23 Ex. 1 at ¶ 40 ("I overpaid RPM when I paid the June [2018] royalties."), ¶ 41 ("Since June 8, 2018, I have initiated actions to facilitate a clean separation from RPM.").

[11] Jaeb Decl., Dkt. 12 at ¶ 30.

[12] Dkt. 23 Ex. 1 at ¶ 55.

[13] *Id.*

### 16.1 Actions to be Taken [Upon Expiration or Termination]

Except as otherwise provided herein, upon termination or expiration, this Agreement and all rights granted hereunder to Franchisee shall terminate and Franchisee shall:

16.1.1 immediately cease to operate the Franchised Business and the specifically developed Real Propertyware and transfer to franchisor the property management accounts, and shall not thereafter, directly or indirectly, represent to the public or hold itself out as a present or former franchisee of Franchisor[.]

\* \* \* \*

16.1.4 take such action as may be necessary to cancel or assign to Franchisor, at Franchisor's option, any assumed name or equivalent registration filed with state, city, or county authorities which contains the name "Real Property ManagementSM" or any other Mark, and Franchisee shall furnish Franchisor with evidence satisfactory to Franchisor of compliance with this obligation within thirty (30) days after termination or expiration of this Agreement[.]

### 16.2 Post-Termination Covenant Not to Compete

16.2.2 Except as otherwise approved in writing by Franchisor, neither Franchisee, nor any holder of a legal or beneficial interest in Franchisee . . . shall, for a period of two (2) years after the expiration or termination of this Agreement, regardless of the cause of termination, either directly or indirectly, for themselves or through, on behalf of or in conjunction with, any person, persons, partnership corporation, limited liability company or other business entity:

16.2.2.1 own an interest in, manage, operate or provide services to any Competitive Business located or operating (a) within a fifty (50) mile radius of the Approved Location, or (b) within a fifty (50) mile radius of the location of any other Real Property Management Business office in existence at the time of termination or expiration; or

16.2.2.2 solicit or otherwise attempt to induce or influence any customer, employee or other business associate of Franchisor to terminate or modify his, her or its business relationship with Franchisor or to compete against Franchisor.

### 22. Dispute Resolution

22.1 Choice of Law – Except to the extent this Agreement or any particular dispute is governed by federal law, this Agreement shall be governed by and construed in accordance with the laws of the State of Utah (without reference to its conflict of laws principles). . . .

> 22.2 Consent to Jurisdiction – Any action brought by either party, except those claims required to be submitted to mediation or arbitration, shall only be brought in the appropriate state or federal court located in or serving Davis County, Utah. . . . Claims for injunctive relief may be brought by Franchisor where Franchisee is located. . . .

**Definitions**

> "Competitive Business" means any business that offers or provides . . . real property management services, or offers other services or products the same as or similar to those provided by Real Property Management Businesses, including, but not limited to, maintenance and repair management services and rent collection services for single-family and condominium properties, or in which the Trade Secrets or other Confidential Information could be used to the disadvantage of Franchisor, any Affiliate or its other franchisees.[14]

**ANALYSIS**

**I.     Forum**

Before reaching the substance of RPM's Motion, the court must first address Averitte's challenge to the court's authority to decide the Motion. The Franchise Agreements contain forum selection clauses stating claims "shall only be brought in the appropriate state or federal court located in or serving Davis County, Utah."[15] The provisions continue: "[c]laims for injunctive relief may be brought by Franchisor where Franchisee is located." Averitte relies on the latter sentence in arguing RPM is restricted from bring its Motion in this court. He maintains RPM may seek injunctive relief against him only in Phoenix or Tucson, where he is located.

Averitte's reading is at odds with the Agreements' plain language. Use of the word "may" in this context is permissive, not mandatory. That is, it gives RPM the option to bring its claim for injunctive relief either in an appropriate court located in Utah – under the forum selection clause – or alternatively "where the Franchisee is located." The permissive nature of

---

[14] Dkt. 15 Ex. 3 at 9; Dkt. 15 Ex. 5 at 9.

[15] *Id.* at § 22.2.

5

the clause is further supported by the Agreements' contrasting use of "shall" in the prior sentence. RPM therefore appropriately brought its Motion in this court, and the court may decide it.

**II.    Preliminary Injunction Standard**

The preliminary injunction RPM seeks is an extraordinary remedy that may only be awarded if the right to relief is "clear and unequivocal."[16] A party seeking a preliminary injunction must make a clear showing that "(1) [it] is substantially likely to succeed on the merits; (2) [it] will suffer irreparable injury if the injunction is denied; (3) [its] threatened injury outweighs the injury the opposing party will suffer under the injunction; and (4) the injunction would not be adverse to the public interest."[17]

RPM's burden is higher here because some of the relief it seeks is mandatory and disfavored in the Tenth Circuit. Specifically, RPM asks the court to order Averitte affirmatively transfer property management accounts to RPM. A movant seeking a disfavored injunction "must make a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of the harms.'" [18] RPM meets its high burden here.

**A. Likelihood of Success on the Merits**

RPM must make a strong showing it is likely to succeed in demonstrating 1) the noncompete provisions are valid and enforceable, and 2) Averitte is in violation of the contract provisions at issue. Before reaching those issues, however, the court must decide what state's law governs the Franchise Agreements.

---

[16] *Dine Citizens Against Ruining Our Env't v. Jewell*, 839 F.3d 1276, 1281 (10th Cir. 2016).

[17] *N.M. Dept. of Game and Fish v. U.S. Dept. of Interior*, 854 F.3d at 1245-46 (10th Cir. 2017) (citations omitted).

[18] *Id.* at 1246 n.15 (quoting *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 976 (10th Cir. 2004) (en banc)).

The Agreements contain a choice-of-law provision selecting Utah state law.[19] Averitte nevertheless contends Arizona law governs, arguing Utah lacks a substantial interest in the dispute and that there is no reasonable basis for the parties to have selected Utah law.

To determine the effect of a choice-of-law provision, courts look to the choice-of-law rules in the forum state. "Utah courts generally uphold choice-of-law provisions based on the intent of the contracting parties and a respect of the parties' right to choose the governing law for a contract."[20] More specifically, under Utah law, "the law of the state chosen by the parties to govern their contractual rights and duties will be applied unless either (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice; or (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue which . . . would be the state of the applicable law in the absence of an effective choice of law by the parties."[21]

Applying that standard to this case, Utah law governs the Franchise Agreements unless (a) Utah has no substantial relationship to the parties or transaction and there is no other reasonable basis for the parties' choice; or (b) application of Utah state law would be contrary to a fundamental policy of Arizona. Neither exception applies here.

---

[19] Dkt. 15 Ex. 3 at § 22.1.

[20] *GRB Enterprises LLC v. JPMorgan Chase Bank, N.A.*, No. 2:11-cv-833-DAK, 2012 WL 845418, at *3 (D. Utah Mar. 12, 2012) (citing *Innerlight, Inc. v. Matrix Group, LLC*, 214 P.3d 854, 857-58 (Utah 2009)).

[21] *Id.* (quoting *Electrical Distributors, Inc. v. SFR, Inc.*, 166 F.3d 1074, 1084 (10th Cir. 1999)).

First, Utah has a substantial relationship to the case because RPM is both incorporated and has its principal place of business here.[22] RPM also signed the Franchise Agreements in Utah.[23] Averitte cites two cases in which courts refused to apply parties' choice-of-law, but both are inapposite. In *In re Mountain West Industries*, the only connection to the chosen state was that the defendant was incorporated there.[24] And in *Prows v. Pinpoint Retail Systems, Inc.,* the chosen state had no substantial relationship to either party or the transaction; the court found the plaintiff's desire to limit the number of forums in which it was required to litigate was not a reasonable basis for the choice.[25]

Second, the court fails to see how application of Utah law would encroach on Arizona's fundamental policies. Noncompete provisions are enforceable under both Utah and Arizona depending on the scope of the restriction and various other factors. The law between the two states differs on the transfer of property management accounts, but not so much as to constitute a fundamental difference in policy. Arizona law requires express written consent before a property owner's property management agreement may be transferred to another licensee or entity,[26] whereas Utah apparently has no such requirement. That Arizona more closely regulates the transfer of accounts is not so significant as to create a fundamental policy. More importantly, RPM does not seek to have the accounts transferred without property owners' written consent,

---

[22] Dkt. 2 at ¶ 11. *See Ershigs, Inc. v. MIR Industrial LLC*, No. 2:16-cv-00258-EJF, 2017 WL 8751733, at *4 (D. Utah Dec. 16, 2017) ("[Plaintiff] is a Washington corporation with its principal place of business in Washington. Thus, Washington has a substantial relationship to the plaintiff in this case.").

[23] Dkt. 36 at 3.

[24] 583 B.R. 514, 526 (Bankr. D. Utah Mar. 30, 2018).

[25] 868 P.2d 809, 811 (Utah 1993).

[26] Ariz. Rev. Stat. Ann. SS 32-2173(A)(1)(j).

and the court does not so order. Rather, as enumerated below, Averitte is ordered to coordinate with RPM to facilitate the lawful transfer of the accounts.

1. *Noncompete Provisions*

Having determined Utah law governs the Franchise Agreements, the next question is whether RPM can make a strong showing the noncompete provisions are valid and enforceable. Covenants not to compete are enforceable under Utah law if the party seeking relief demonstrates, "(1) the agreement is supported by consideration, (2) there was no bad faith in contract negotiations, (3) the agreement is necessary to protect the goodwill of the business, and (4) it is reasonable in its restrictions in terms of time and geographic area."[27]

Averitte does not appear to dispute the first and second prongs. Nothing in the record calls into doubt RPM's assertion that the Franchise Agreements were supported by adequate consideration and entered in good faith.

Turning to the third prong, the parties dispute whether the noncompete provisions are necessary to protect RPM's goodwill or are merely – as Averitte contends – "bald restraints on competition." Noncompete provisions in general have been found necessary to protect franchisors' goodwill.[28] In *Bad Ass Coffee*, for example, another Judge in this district found a former franchisee's competitive conduct was likely to "send negative messages" about the franchisor to the market and to other franchisees, and signal to other franchisees they could "immediately start competing if they are unhappy with [the franchisor]."[29]

---

[27] *Bad Ass Coffee Co. of Hawaii, Inc. v. JH Nterprises, LLC*, 636 F. Supp. 2d 1237, 1245-46 (D. Utah 2009) (quoting *Kasco Servs. Corp. v. Benson*, 831 P.2d 86, 88 n.1 (Utah 1992)).

[28] *E.g. id.* at 1246 ("[I]t is apparent that covenants not to compete protect a franchising company's goodwill.").

[29] *Id.*

Similar considerations persuade the court the noncompete provision here is necessary to protect RPM's goodwill. RPM submits it spent years building its goodwill, including the company's reputation, brand recognition, and customer base.[30] The two-year noncompete period is reasonable and necessary to "allow[] the public and RPM's customer base adequate time to stop identifying a former franchisee with the RPM brand."[31] The noncompete is also necessary to protect current franchisees from unfair competition by former franchisees.[32] Finally, as in *Bad Ass Coffee*, Averitte's conduct is likely to undermine the integrity of RPM's franchisee system, signaling to other franchisees they could immediately begin competing with RPM without consequence.

The fourth noncompete prong, reasonableness of the restriction, is contested. "Utah courts consider the following factors in determining the reasonableness of non-compete agreements: "[1] [g]eographical extent; [2] the duration of the limitation; [3] the nature of the employee's duties; and [4] the nature of the interest which the employer seeks to protect such as trade secrets, the goodwill of his business, or an extraordinary investment in the training or education of the employee."[33] The restriction must be "carefully drawn to protect only the legitimate interests of the employer."[34]

Under the terms of the noncompete, Averitte is prohibited from competing with RPM for two years, within a fifty-mile radius of his former franchisee or any of RPM's other franchise

---

[30] Krause Decl., Dkt. 15 at ¶ 14.

[31] Dkt. 11 at 11; Krause Decl. at ¶ 66.

[32] Dkt. 11 at 11-12; Krause Decl. at ¶¶ 54-55.

[33] *First Am. Title Ins. Co. v. Nw. Title Ins. Agency, LLC*, No. 2:15-CV-00229-DN, 2016 WL 6902473, at *17 (D. Utah Nov. 23, 2016).

[34] *Robbins v. Finlay*, 645 P.2d 623, 627 (Utah 1982).

locations.[35] Averitte contends this restriction is unreasonable for several reasons.

First, Averitte argues the geographic scope is unreasonable because it encompasses RPM franchise locations in forty-six states, including states in which Averitte "has never operated" and "has no intention of doing so."[36] But the reasonableness of a noncompete provision is to be assessed "on a case-by-case basis, taking into account the particular facts and circumstances surrounding the case and the subject covenant."[37] Given Averitte's representation that he has no intention of operating his business outside Arizona, the court can limit its analysis to whether it is reasonable to restrict Averitte from competing within fifty miles of any RPM franchise in Arizona.

With that in mind, RPM is likely to succeed in showing the geographic restriction is reasonable. A restrictive covenant is generally enforceable if it "specifies an area no greater than that to which the business extends."[38] RPM has nine RPM franchises in Arizona. Of those nine, six are in Phoenix, two in Tucson, and one in Kingman, a city 200 miles from Phoenix.[39] Apart from the Kingman franchise, then, the noncompete effectively prohibits Averitte from competing within fifty miles of his two former franchises. This restriction directly tracks the area in which

---

[35] Dkt. 15 Ex. 3 at § 16.2.

[36] Dkt. 23 at 23.

[37] *Systems Concepts v. Dixon*, 669 P.2d 421, 427 (Utah 1983). *See also J&K Computer Sys. v. Parrish*, 642 P.2d 732, 736 (Utah 1982) (declining to consider whether a covenant not to compete was reasonable in its entirety, instead deciding only "that the covenant was enforceable as it related to [the defendant's violation]"). *See also Bad Ass Coffee*, 636 F. Supp. 2d at 1247 ("Following Utah law, the decision maker would likely limit itself to considering whether Defendants' operation of Java Cove at its present location violates the covenants not to compete.").

[38] *Elec. Distributors, Inc. v. SFR, Inc.*, 166 F.3d 1074, 1085 (10th Cir. 1999) (quoting 54A Am. Jur. 2d § 861 at 169).

[39] Dkt. 11 at 13-14.

11

Averitte's RPM franchises extended, and is in line with geographic restrictions found by other courts to be reasonable.[40]

Averitte does not specifically argue the duration of the restriction is unreasonable, though he does seek to distinguish Utah cases upholding longer restrictions. RPM claims the two-year period is necessary to give current and potential RPM customers time to stop identifying Averitte with RPM, and to allow it time to locate and train a replacement franchisee.[41] In light of these representations and the nature of the underlying business model, the court is persuaded RPM is likely to show the two-year restriction is reasonable.

Finally, Averitte argues the activity restriction in the noncompete is overbroad, prohibiting him from providing services not provided by RPM. The Agreements define a "Competitive Business" as one providing services "the same as or similar to those provided by Real Property Management Business, including but not limited to, maintenance and repair management services and rent collection services for single-family and condominium properties."[42] Beyond the services specifically listed in this provision, RPM has not provided evidence sufficient to allow the court to identify what other services, if any, fall within the scope of the restriction. Therefore, at least until the factual record is more fully developed, the court can only find the Agreements to prohibit Averitte from providing property management services for single-family and condominium properties, including maintenance and repair management and rent collection services. Given those parameters, RPM can likely show the activity

---

[40] *See, e.g.*, *First Am. Title Ins. Co.*, 2016 WL 6902473, at *15 (finding reasonable a geographic limitation covering an area 100-miles from any of the business's offices).

[41] Dkt. 11 at 14-15; Krause Decl. at ¶ 66.

[42] Dkt. 15 Ex. 3 at 6.

restriction is not overbroad, but rather "carefully drawn to protect only [RPM's] legitimate interests."[43]

The parties do not address the third and fourth factors, but they also support the reasonableness of the restriction. As a franchisee, Averitte essentially acted as RPM's representative. And as described above and below, RPM likely has a legitimate interest in protecting its goodwill, reputation, and franchise system by preventing former franchisees from directly competing in franchise territories.

For these reasons, the court finds RPM makes a strong showing it is likely to succeed in demonstrating the noncompete provision is reasonable and enforceable under Utah law.

### 2. *Breach of Contract Provisions*

RPM must also show it can likely prove Averitte is in breach of the Franchise Agreement provisions that provide a basis for the injunctive relief sought. Averitte does not deny the existence of references to RPM on Zorion Management's "online presence," but maintains he is making efforts to deidentify and that any remaining references are inadvertent or out of his control.[44] He declares he is "ready [to] assign the tradename Real Property Management Pinnacle to RPM once RPM advises me how it wants this to occur."[45]

Averitte does not dispute that he operates Zorion Management out of the same location as his former Phoenix Franchise, that Zorion Management provides various property management services including services provided by RPM,[46] or that Averitte has not transferred any property

---

[43] *Robbins*, 645 P.2d at 627.

[44] Dkt. 23 at 28.

[45] Dkt. 23 Ex. 1 at ¶ 54.

[46] Dkt. 23 Ex. 1 at ¶ 55.

13

management accounts to RPM.[47] But he argues his operation of Zorion Management does not violate the Franchise Agreements because the noncompete provision only prohibits him from using the "RPM System" in a new business.

The court disagrees. The plain language of the Agreement prohibits the operation of a "Competitive Business," and that term is defined without reference to RPM's "System."[48]

Given the record, RPM makes a strong showing it can likely succeed in showing Averitte is in breach of his duties and obligations in the Franchise Agreements.

## B. Irreparable Harm

Next, RPM must show it will suffer irreparable injury absent the requested preliminary injunction. "A plaintiff satisfies the irreparable harm requirement by demonstrating a significant risk that he or she will experience harm that cannot be compensated after the fact by monetary damages."[49] The injury must be "certain, great, actual and not theoretical."[50]

As an initial matter, the Franchise Agreements provide that breach of the non-compete provisions will constitute irreparable harm.[51] While this is significant, it does not satisfy RPM's burden.

RPM argues that without an injunction, Averitte's conduct will cause a "resulting domino effect [which] could jeopardize the RPM franchise system."[52] Lukas Krause, RPM's President, testifies that 35 of RPM's franchisees are currently in renewal negotiations and 29 are up for

---

[47] Dkt. 23 at 12-13.

[48] *See* Dkt. 15 Ex. 3 at 6.

[49] *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009) (quotation omitted).

[50] *N.M. Dep't of Game and Fish*, 854 F.3d at 1251 (quoting *Heideman v. South Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003)).

[51] Dkt. 15 Ex. 3 at § 21.21.

[52] Dkt. 36 at 8.

renewal in 2019.[53] Krause also states that some franchisees are stalling renewal discussions while they monitor Averitte's conduct.[54] He claims two former Arizona franchisees, whom he identifies by name, abruptly abandoned renewal negotiations after Averitte "actively meddl[ed]" in the negotiations.[55] The two individuals are defendants in another proceeding brought by RPM currently pending before another judge in this district.[56] Given Krause's testimony, the court agrees the threatened harm Averitte's conduct poses to RPM's franchise system is "certain, great, actual and not theoretical."[57]

RPM also argues that unless Averitte is enjoined, it will suffer irreparable harm in the form of loss of goodwill, customer loyalty, and brand recognition. The court agrees. In *Bad Ass Coffee*, the court found irreparable injury where a former franchisee made an "overnight switch," in part because of the negative message the switch was likely to send to customers about the franchisor.[58] That reasoning applies here. Furthermore, RPM has made a strong showing Averitte continues to hold himself out as affiliated with RPM, threatening the integrity of RPM's brand recognition. A preliminary injunction is therefore necessary to prevent significant risk of irreparable injury to RPM's goodwill and other intangible assets.

C. **Balance of Harms**

The court must next balance the harms to RPM identified above against any harm to Averitte if the preliminary injunction is granted. Averitte argues the injunction will cause him to

---

[53] Dkt. 37 at ¶ 14.

[54] *Id*.

[55] Krause Supp. Decl. ¶ 15.

[56] Case No. 2:18-cv-592.

[57] *See Bad Ass Coffee*, 636 F. Supp. 2d at 1249 (finding irreparable harm where other franchisees were "keeping a close eye" on the case, and "it would be reasonable to think that other BACH franchisees might be emboldened to follow in Defendants' footsteps").

[58] *Bad Ass Coffee*, 636 F. Supp. 2d at 1249.

lose business "he has worked diligently to develop over the course of the last ten plus years."[59] He also argues the injunction will "effectively prevent [him] from using his own system of property management for two years within 50 miles of any RPM location around the country."[60] RPM correctly points out that Averitte's harms are self-inflicted and could have been avoided, eliminating or at least lessening their weight in the analysis.[61] Weighing those harms against the serious harm RPM will face absent injunctive relief, the court finds RPM meets its burden to make a strong showing on this factor.

### D. Public Interest

The injunctive relief RPM seeks is not adverse to the public interest. The public has a strong interest in the enforcement of valid contracts, including reasonable and enforceable noncompete provisions. Averitte will surely suffer harm if enjoined, but any such harm is self-inflicted and "not properly considered as harm[] to the 'public interest' anyway."[62] Averitte argues the public has an interest in the freedom to choose their own property managers and not to have their accounts transferred "absent their informed consent." The injunction ordered below does not require – or even permit – any account be transferred absent the client's informed consent. Averitte does not point to any other way in which the public would be harmed by the injunction.

---

[59] Dkt. 23 at 32.

[60] *Id.*

[61] *See Sierra Club, Inc. v. Bostick*, 539 Fed. Appx. 885, 894 (10th Cir. 2013) ("[T]here is some support in judicial decisions in our circuit and elsewhere for the idea that 'self-inflicted' harm should not be accorded weight in the balance of harms . . . .").

[62] *Bad Ass Coffee*, 636 F. Supp. 2d at 1252.

16

### E. Security

Under Rule 65 of the Federal Rules of Civil Procedure, courts have "wide discretion" in determining the appropriate level of security necessary to compensate a wrongfully enjoined party.[63] Upon consideration of the serious implications this injunction poses to Averitte, on the one hand, and the strength of RPM's showing on the other hand, the court finds a $40,000 bond is proper and sufficient.

### ORDER

For the reasons discussed above, the court finds RPM meets its heavy burden to show it is entitled to preliminary injunctive relief. The court therefore issues the following Order:

1. Plaintiff's Motion for Preliminary Injunction[64] is GRANTED.

2. Defendant Averitte is enjoined from owning an interest in, operating, managing, or providing services to any Competitive Business located or operating within fifty miles of the location of: (a) Averitte's Phoenix Arizona Franchise; (b) Averitte's Tucson Arizona Franchise; or (c) any other RPM franchise location in existence as of June 18, 2018. This restriction will be in effect until the earlier of December 10, 2019, subsequent order of this court, or final resolution of the case on its merits.[65]

    a. The term "Competitive Business" in this Order means any business that offers or provides real property management services, or offers other services or products the same as or similar to those provided by Real Property Management Businesses, including maintenance and repair management services and rent collection services for single-family and condominium properties. "Competitive Business" does not mean a business offering or providing pet-sitting services, house-sitting services, or traditional real estate sales and purchases.

---

[63] *RoDa Drilling Co.*, 552 F.3d at 1214 (quoting *Winnebago Tribe of Nebraska v. Stovall*, 341 F.3d 1202, 1206 (10th Cir. 2003)).

[64] Dkt. 11.

[65] The parties dispute when the noncompete provision was triggered. Averitte argues the relevant dates are August 3, 2017 and December 10, 2017, when the Agreements ended on their terms. RPM argues the parties continued to operate under an implied-in-fact contract governed by the terms of the Agreements until at least June 18, 2018. Without deciding whether the parties formed an implied contract, the court finds the noncompete provisions apply until at least December 10, 2019. If this case is still pending and the parties have not resolved their dispute as that date approaches, RPM may reassert its arguments in a motion to extend the preliminary injunction.

3. Defendant Averitte is enjoined from representing to the public or holding himself out, in connection with any marketing, advertising, or promotional materials or efforts, as a current or former franchisee of RPM, pursuant to § 16.1 of the Franchise Agreements.

4. Defendant must take the following corrective actions on or before September 14, 2018:

    a. Disconnect or disable all phone numbers previously used by RPM Pinnacle or Real Property Management Pinnacle;

    b. Cease referring or redirecting numbers previously used by RPM Pinnacle or Real Property Management Pinnacle to numbers owned, used by, or affiliated with Zorion Real Estate and Management, Zorion, and Zorion Real Estate & Management or any other competing business;

    c. Disable rpmpin.com and rpmpintuc.com, and all websites, including Google+ websites, links, meta tags, social media pages, including Facebook, and all other internet listings that reference RPM, Real Property Management, or any other marks of Plaintiff;

    d. Cease referring or redirecting rpmpin.com and rpmpintuc.com to websites owned or affiliated with Zorion Real Estate and Management, Zorion, and Zorion Real Estate & Management, including zreteam.com and zreteamtuc.com, or any other competing business; and

    e. Remove all RPM and/or Real Property Management customer reviews, references, and marketing materials from, www.randallaveritte.com, zreteam.com, zreteamtuc.com, and the websites of any other competing business in which Averitte affiliates with, owns an interest in, operates, or manages.

5. Defendant Averitte is ordered to assign the tradenames Real Property Management Pinnacle and RPM Pinnacle to Plaintiff, pursuant to § 16.1.4 of the Franchise Agreements on or before November 1, 2018. RPM shall provide Averitte with any documents in its possession necessary to facilitate said assignment on or before October 1, 2018.

6. Defendant Averitte is ordered to assign all active customer accounts acquired during the term of his RPM franchises through use of RPM Systems to RPM pursuant to §§ 1.4, 16.1.1, and 16.4 of the Franchise Agreements.

a. The parties are ordered to comply with Arizona law with respect to RPM's assumption of control of the Accounts. The parties will proceed with the following process, to the extent the process complies with Arizona law.

b. On or before September 12, 2018, Defendant Averitte will provide to Plaintiff in a searchable and readable electronic form a customer list, which will include relevant contact information, the governing management agreement, and copies of the existing tenant agreement(s).

c. On or before September 14, 2018, Defendant Averitte will execute a joint communication with Plaintiff. The joint communication will advise customers that Defendant Averitte will no longer be providing them real property management services and that he will be assigning all active customer accounts to RPM or one of its RPM franchisees, if the client consents; that pursuant to Arizona law, RPM has in place a licensed broker who can provide the same level of service that the customer has come to expect from the RPM brand; and that there will be no interruption in RPM's management of the properties.

d. The communication to the customers will include a request to consent to the assignment of their management agreements with RPM Pinnacle to another local RPM franchisee and broker licensed under Arizona law.

e. The communication will advise the customers that if the consent is not signed and returned to RPM by October 14, 2018, the management agreements with RPM Pinnacle will be terminated, effective November 1, 2018.

f. On or before September 14, 2018, RPM shall designate the Arizona-licensed broker(s) chosen to act on its behalf.

7. This Order shall remain in place until subsequent order of this court or final resolution of the case on its merits. This Order shall bind the parties' agents, servants, employees, and attorneys, and other persons who are in active concert or participation with them who receive actual notice of this injunction.

8. Defendant Averitte is further ordered to reimburse RPM's costs, including reasonable accounting and attorneys' fees, in connection with RPM's enforcement of the Franchise Agreements in this Action.[66] Within ten (10) days of entry of this Order, counsel for RPM shall submit to the court the requested amount of costs and attorneys' fees it seeks to recover from Defendant Averitte, together with all supporting documentation.

---

[66] Dkt. 15-5 § 21.4.

9. Pursuant to Rule 65(c), RPM shall post with the court a bond or cash in the amount of $40,000 (Forty Thousand Dollars) on or before September 12, 2018.

DATED this 10th day of September, 2018.

> BY THE COURT:
>
> _____
> ROBERT J. SHELBY
> United States District Judge